UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

----------------------------------------------------- x
                              :

ANDREA H. SINCLAIR,          :          3:18-CV-00656 (RMS)
     *Plaintiff*,          :
                              :

v.                           :
                              :

ANDREW M. SAUL,          :
COMMISSIONER OF       :
SOCIAL SECURITY[1]      :        DATE: JULY 22, 2019
     *Defendant*.       :
                              :
----------------------------------------------------- x

## RULING ON THE PLAINTIFF'S AMENDED MOTION FOR SUMMARY JUDGMENT AND ON THE DEFENDANT'S MOTION TO AFFIRM THE DECISION OF THE COMMISSIONER

This action, filed under § 205(g) of the Social Security Act, 42 U.S.C. § 405(g), seeks review of a final decision by the Commissioner of Social Security ["SSA" or "the Commissioner"] denying the plaintiff's application for Social Security Disability Insurance ["SSDI"] benefits.[2]

## I.    ADMINISTRATIVE PROCEEDINGS

On or about February 27, 2014, the plaintiff filed an application for SSDI benefits claiming that she has been disabled since January 1, 2011, due to the following conditions: seizures; opiate and benzodiazepine addiction; "spinal fusion/scoliosis/spondylolisthesis"; chronic migraine

---

[1] The plaintiff commenced this action against Nancy A. Berryhill, as Acting Commissioner of Social Security. (Doc. No. 1). On June 17, 2019, Andrew M. Saul became the Commissioner of Social Security. Because Nancy A. Berryhill was sued in this action only in her official capacity, Andrew M. Saul is automatically substituted for Nancy A. Berryhill as the named defendant. *See* Fed. R. Civ. P. 25(d). The Clerk of the Court shall amend the caption in this case as indicated above.

[2] In her decision, the Administrative Law Judge ["ALJ"] stated that the plaintiff also filed a Title XVI application for Supplemental Security Income ["SSI"] on February 28, 2014. The Certified Transcript of Administrative Proceedings, however, does not include an application for SSI, nor is it mentioned in the parties' respective briefs. Accordingly, the Court will address only the plaintiff's application for Social Security Disability Insurance ["SSDI"] benefits in this Ruling.

headaches; "Lyme [d]isease & co-infections"; Behcet's syndrome; chronic pain, chronic depression; irritable bowel syndrome ["IBS"]; and gastroparesis. (Doc. No. 10 (Certified Transcript of Administrative Proceedings, dated June 6, 2018 ["Tr."]) 103, 123, 150). The Commissioner denied the plaintiff's application initially and upon reconsideration. (Tr. 103–22, 123–47). On November 4, 2014, the plaintiff requested a hearing before an Administrative Law Judge ["ALJ"]. (Tr. 166–67). On October 4, 2016, a hearing was held before ALJ Mary Beth O'Connor, at which the plaintiff and a vocational expert, Robin L. Generaux, testified. (Tr. 40–102; *see* Tr. 227, 251, 257). On November 2, 2016, the plaintiff amended her alleged onset date to March 8, 2011, and requested a closed period of disability, which began on the amended alleged onset date and ended on June 13, 2014.[3] (Tr. 280). On January 9, 2017, the ALJ issued an unfavorable decision denying the plaintiff's claim for benefits. (Tr. 10–34). On August 4, 2016, the plaintiff requested review of the hearing decision (Tr. 258–61; *see also* Tr. 35–39), and on February 20, 2018, the Appeals Council denied the plaintiff's request for review, thereby rendering the ALJ's decision the final decision of the Commissioner. (Tr. 1–6).

The plaintiff filed her complaint in this pending action on April 18, 2018. (Doc. No. 1). On July 11, 2018, the defendant filed her Answer and Certified Administrative Transcript, dated June 6, 2018. (Doc. No. 10). On August 2, 2018, the parties consented to the jurisdiction of a United States Magistrate Judge (Doc. Nos. 15 & 16), and the case was reassigned to this Magistrate Judge on August 3, 2018. (Doc. No. 17). On September 10, 2018, the plaintiff filed her Motion for Summary Judgment (Doc. No. 19), with brief in support (Doc. No. 19-1). The parties filed

---

[3] Typically, the relevant time period for claims for SSDI benefits is between the claimant's alleged onset date and the claimant's date last insured. *See McLellan v. Astrue*, No. 3:12-CV-1657 (DFM), 2016 WL 4126414, at *1 n.1 (D. Conn. Aug. 3, 2016). For SSI benefits, the relevant time period is between the date on which the claimant filed her application for SSI and the date of the ALJ's decision. *See Stergue v. Astrue*, No. 3:13-CV-25 (DFM), 2014 WL 12825146, at *2 (D. Conn. May 30, 2014). In this case, however, the plaintiff requested a closed period of disability of March 8, 2011 through June 13, 2014. (*See* Tr. 280). Therefore, the plaintiff had to establish that she was disabled at some point during the closed period of disability, between March 8, 2011 and June 13, 2014.

their Joint Statement of Material Facts on December 21, 2018 (Doc. No. 30); and on that same

day, the plaintiff filed an amended Motion for Summary Judgment (Doc. No. 32), with brief in

support (Doc. No. 32-1 ["Pl.'s Mem."]).  On January 28, 2019, the defendant filed her Motion to

Affirm the Decision of the Commissioner (Doc. No. 34), with brief in support (Doc. No. 34-1

["Def.'s Mem."]).  On February 11, 2019, the plaintiff filed her reply brief.  (Doc. No. 35).

For the reasons stated below, the plaintiff's Amended Motion for Summary Judgment

(Doc. No. 32) is *denied*, and the defendant's Motion to Affirm (Doc. No. 34) is *granted*.

## II.     FACTUAL BACKGROUND[4]

The Court presumes the parties' familiarity with the plaintiff's medical history, which is

thoroughly discussed in the Joint Stipulation of Facts (Doc. No. 30).  The Court cites only the

portions of the record that are necessary to explain this decision.

## III.    THE ALJ'S DECISION

Following the five-step evaluation process,[5] the ALJ found that the plaintiff had not

engaged in substantial gainful activity since her amended alleged onset date of March 8, 2011.

---

[4] The Court adopts and incorporates by reference the Joint Stipulation of Facts (Doc. No. 30).  Throughout this Ruling, commonly used medical terms do not appear in quotation marks although the terms are taken directly from the plaintiff's medical records.

[5] An ALJ determines disability using a five-step analysis.  *See* 20 C.F.R. § 404.1520.  First, the ALJ must determine whether the claimant is currently working.  *See* 20 C.F.R. § 404.1520(a)(4)(i).  If the claimant is currently employed, the claim is denied.  *Id.*  If the claimant is not working, as a second step, the ALJ must make a finding as to the existence of a severe mental or physical impairment; if none exists, the claim is also denied.  *See* 20 C.F.R. § 404.1520(a)(4)(ii).  If the claimant is found to have a severe impairment, the third step is to compare the claimant's impairment with those in Appendix 1 of the Regulations [the "Listings"].  *See* 20 C.F.R. § 404.1520(a)(4)(iii); *Bowen v. Yuckert*, 482 U.S. 137, 141 (1987); *Balsamo v. Chater*, 142 F.3d 75, 79–80 (2d Cir. 1998).  If the claimant's impairment meets or equals one of the impairments in the Listings, the claimant is automatically considered disabled. *See* 20 C.F.R. § 404.1520(a)(4)(iii); *see also Balsamo*, 142 F.3d at 80.  If the claimant's impairment does not meet or equal one of the listed impairments, as a fourth step, she will have to show that she cannot perform her former work. *See* 20 C.F.R. § 404.1520(a)(4)(iv).  If the claimant shows she cannot perform her former work, the burden shifts to the Commissioner to show that the claimant can perform other gainful work.  *See Balsamo*, 142 F.3d at 80 (citations omitted).  Accordingly, a claimant is entitled to receive disability benefits only if she shows she cannot perform her former employment, and the Commissioner fails to show that the claimant can perform alternate gainful employment. *See* 20 C.F.R. § 404.1520(a)(4)(v); *see also Balsamo*, 142 F.3d at 80 (citations omitted).

(Tr. 15, citing 20 C.F.R. §§ 404.1571 *et seq.*, and 416.971, *et seq.*).  The ALJ concluded that the plaintiff had the following severe impairments: epilepsy; substance addiction; degenerative disc disease; depression; anxiety; migraines; gastroparesis; and IBS.[6]  (Tr. 15, citing 20 C.F.R. §§ 404.1520(c) and 416.920(c)).  At step three, the ALJ found that the plaintiff did not have an impairment or a combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 16, citing 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926).  The ALJ determined that the plaintiff had the residual functional capacity ["RFC"] to perform light work, as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b), except that she could occasionally climb ramps and stairs, balance, and crawl; she could never climb ladders, ropes, or scaffolds; she could frequently stoop, kneel, and crouch; she had to avoid concentrated exposure to noise and even moderate exposure to unprotected heights and moving mechanical parts; and she was limited to simple, repetitive, routine tasks.  (Tr. 18).  At step four, the ALJ stated that the plaintiff was unable to perform any past relevant work.  (Tr. 24, citing 20 C.F.R. §§ 404.1565 and 416.965).  At step five, after considering the plaintiff's age, education, work experience, and RFC, the ALJ concluded that there were significant numbers of jobs in the national economy that the plaintiff could perform.  (Tr. 24, citing 20 C.F.R. §§ 404.1569, 404.1569(a), 416.969, and 416.969(a)).  Accordingly, the ALJ found that the plaintiff was not under a disability, as defined in the Social Security Act, at any time from the amended alleged onset date of March 8, 2011, through the date of her decision.[7]  (Tr. 25, citing 20 C.F.R. §§ 404.1520(g) and 416.920(g)).

---

[6] The ALJ stated that "[a]lthough there are references as to other isolated conditions, including but not limited to a suggestion of Lyme disease," those conditions were "non-severe."  (Tr. 16).  The ALJ reasoned that the evidence regarding these non-severe conditions "indicates these conditions had acute onsets and were either generally resolved immediately with appropriate treatment or never lasted 12 continuous months."  (Tr. 16).

[7] The relevant time period in this case is the closed period of disability of March 8, 2011 through June 13, 2014.  *See supra* note 3.

IV.    STANDARD OF REVIEW

The scope of review of a Social Security disability determination involves two levels of inquiry.  First, the court must decide whether the Commissioner applied the correct legal principles in making the determination.  *See Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998) (citation omitted).  Second, the court must decide whether substantial evidence supports the determination. *See id.*  The court may "set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by substantial evidence or if the decision is based on legal error."  *Burgess v. Astrue*, 537 F.3d 117, 127 (2d Cir. 2008) (citation and internal quotations marks omitted); *see also* 42 U.S.C. § 405(g).  Substantial evidence is evidence that a reasonable mind would accept as adequate to support a conclusion; it is more than a "mere scintilla." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citation omitted); *see Yancey v. Apfel*, 145 F.3d 106, 111 (2d Cir. 1998) (citation omitted).  The substantial evidence rule also applies to inferences and conclusions that are drawn from findings of fact.  *See Gonzalez v. Apfel*, 23 F. Supp. 2d 179, 189 (D. Conn. 1998) (citation omitted); *Rodriguez v. Califano*, 431 F. Supp. 421, 423 (S.D.N.Y. 1977) (citations omitted).  However, the court may not decide facts, reweigh evidence, or substitute its judgment for that of the Commissioner.  *See Dotson v. Shalala*, 1 F.3d 571, 577 (7th Cir. 1993) (citation omitted).  Instead, the court must scrutinize the entire record to determine the reasonableness of the ALJ's factual findings.  *See id.*  Furthermore, the Commissioner's findings are conclusive if supported by substantial evidence and should be upheld even in those cases where the reviewing court might have found otherwise.  *See* 42 U.S.C. § 405(g); *see also Beauvoir v. Chater*, 104 F.3d 1432, 1433 (2d Cir. 1997) (citation omitted); *Eastman v. Barnhart*, 241 F. Supp. 2d 160, 168 (D. Conn. 2003).

V.    DISCUSSION

In this appeal, the plaintiff contends that the ALJ erred in three general regards. First, the plaintiff argues that the ALJ applied improperly the treating physician rule and misconstrued the objective evidence in the record. (Pl.'s Mem. at 18–26). Second, the plaintiff maintains that the ALJ failed to consider adequately the plaintiff's subjective complaints about her condition. (Pl.'s Mem. at 26–31). Finally, the plaintiff claims that the ALJ erred at step five of the sequential analysis by failing to account for certain non-exertional limitations. (Pl.'s Mem. at 31). The defendant responds that substantial evidence supports the ALJ's decision that the plaintiff was not disabled at any time during the closed period of disability. (Def.'s Mem. at 6).

A.      THE ALJ'S EVALUATION OF THE OBJECTIVE MEDICAL EVIDENCE
        AND APPLICATION OF THE TREATING PHYSICIAN RULE

The plaintiff claims that substantial evidence does not support the ALJ's conclusions regarding the medical opinion evidence or, alternatively, that such conclusions run contrary to law. (Pl.'s Mem. at 18). The plaintiff relies on several arguments to support this claim. First, the plaintiff contends that the ALJ determined erroneously the length of the plaintiff's treatment with one of her mental health treatment providers and that such error was not harmless. (Pl.'s Mem. at 18–20). Second, the plaintiff asserts that the ALJ failed to address adequately the objective findings and medical opinion of Gaurav Kapur, M.D., regarding the impairments to the plaintiff's lumbar spine. (Pl.'s Mem. at 20–22). Third, the plaintiff maintains that the ALJ failed to address adequately an unsigned, undated medical opinion statement, which she claims was produced by Zeb Ali, M.D. (Pl.'s Mem. at 22–23). Fourth, the plaintiff claims that the ALJ weighed too greatly the opinions of the State agency medical sources. (Pl.'s Mem. at 23–24). Fifth, the plaintiff alleges that the ALJ erred by concluding that an opinion of the plaintiff's mental health providers lacked "expertise and knowledge" to the extent that the opinion discussed the plaintiff's physical impairments. (Pl.'s Mem. at 24–25). Finally, the plaintiff argues that the ALJ afforded too much

weight to the opinion of the consultative examiner. (Pl.'s Mem. at 25–26). The defendant responds that the ALJ weighed and evaluated properly the medical opinions of record. (Def.'s Mem. at 6).

The treating physician rule requires that "the opinion of a claimant's treating physician as to the nature and severity of the impairment is given 'controlling weight' so long as it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record.'" *Burgess*, 537 F.3d at 128, (quoting 20 C.F.R. § 404.1527(d)(2)). When the ALJ "do[es] not give the treating source's opinion controlling weight," she must "apply the factors listed" in 20 C.F.R. § 404.1527(c)(2), including "(1) the frequency, length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist." *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (per curiam). Once the ALJ has considered these factors, the ALJ must "comprehensively set forth [her] reasons for the weight assigned to a treating physician's opinion." *Halloran v. Barnhart*, 362 F.3d 28, 33 (2d Cir. 2004); *see* 20 C.F.R. § 404.1527(c)(2) ("We will always give good reasons in our notice of determination or decision for the weight we give [the claimant's] treating source's medical opinion."). "A failure by the Commissioner to provide 'good reasons' for not crediting the opinion of a treating physician is a ground for remand." *Hanes v. Comm'r Soc. Sec.*, No. 11-CV-1991 (JFB), 2012 WL 4060759, at *12 (E.D.N.Y. Sept. 14, 2012) (citing *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999)).

1.     THE LENGTH OF THE PLAINTIFF'S TREATMENT RELATIONSHIP WITH FRANCISCAN LIFE CENTER

The plaintiff maintains that the ALJ determined erroneously that the plaintiff's treatment relationship with the Franciscan Life Center ["FLC"] began in March 2014, as it actually began in May 2013, and that this error warrants remand. (Pl.'s Mem. at 18–20). Specifically, the plaintiff

argues that "application of the correct information would lead as a matter of law to finding the medical opinion entitled to more weight," which in turn "would lead to the determination that the [p]laintiff was disabled for the closed period of alleged disability."  (Pl.'s Mem. at 19–20).  The defendant concedes that "the ALJ made a mistake when calculating the length of [the] [p]laintiff's treatment at the [FLC,]" but avers that this error is harmless.  (Def.'s Mem. at 6–7).  The Court agrees with the defendant.

"Where . . . an ALJ misreads a critical piece of evidence in the record, and then relies on his error in reaching [her] opinion, the opinion cannot be said to be supported by 'substantial evidence.'"  *Joseph v. Astrue*, No. 06-Civ-1356 (DCF), 2007 WL 5035942, at *5 (S.D.N.Y. Dec. 28, 2007), Magistrate Judge's Recommended Ruling approved and adopted, No. 06-Civ-1356 (RMB), 2008 WL 850158 (Mar. 20, 2008) (citing *Maldonado v. Apfel*, No. 98-Civ-9037 (AKH), 2000 WL 23208, at *3–4 (S.D.N.Y. Jan. 13, 2000)); *see also McHugh v. Astrue*, No. 11-CV-00578 (MAT), 2013 WL 4015093, at *9 (W.D.N.Y. Aug. 6, 2013).  "Further, in some cases where the ALJ bases [her] decision on a misinterpretation of the evidence, remand may be warranted to afford the ALJ with an opportunity to re-evaluate the plaintiff's claim in light of what the evidence actually reveals."  *Joseph*, 2007 WL 5035942, at *5 (citing *Lipsman v. Apfel*, No. 98-Civ-0743 (HB), 1998 WL 409708, at *6–7 (S.D.N.Y. July 20, 1998)).  *See Malave v. Sullivan*, 777 F. Supp. 247, 253 (S.D.N.Y. 1991) (explaining that, to the extent the ALJ's decision was based on a misreading of the evidence, the decision was "not supported by substantial evidence in the record"); *see also Latour-Darch v. Colvin*, 14-CV-3000 (SLT), 2017 WL 2964812, at *9 (E.D.N.Y. July 10, 2017) (same).  Although remand based on the ALJ's misreading of the record may be appropriate in some cases, "courts in other instances have held the error to be harmless if the ultimate determination is nonetheless supported by substantial evidence."  *Howarth v.*

*Berryhill*, No. 3:16-CV-1844 (JCH), 2017 WL 6527432, at *16 (D. Conn. Dec. 21, 2017) (citing

*Trombley v. Colvin*, No. 8:15-CV-567 (TWD), 2016 WL 5394723, at *4 n.6 (N.D.N.Y. Sept. 27,

2016)); *Coates v. Colvin*, No. 5:12-CV-1340 (GLS), 2013 WL 3148222, at *4 (N.D.N.Y. June 19,

2013)).

     Here, the ALJ afforded "partial weight" to an assessment of the plaintiff that a therapist

from the FLC completed in March 2014. (Tr. 23). The ALJ reasoned that

> [t]he record does support mental health limitations consistent with simple, routine, repetitive work based on her impairments with mental status exams showing impaired judgment, depressed mood and constricted affect. However, the treatment record does not support any other restrictions based on the overall conservative treatment, and normal mental status exams in the closed period. In addition, the undersigned notes that this therapist had a relatively short treating relationship with the claimant, of three months in 2014, and thus she does not have the full picture of the claimant's longitudinal history. She also cannot speak to the majority of the requested closed period, as she was not treating the claimant from 2011 to 2013.

(Tr. 23). As noted above, the defendant concedes that the ALJ determined improperly that the

treating relationship between the plaintiff and the FLC was only three months, and that the FLC

treated the plaintiff from May 2013 to March 2014. (*See* Def.'s Mem. at 6–7).

     The Court concludes that a proper understanding of the length of the plaintiff's treating

relationship with the FLC would not "lead to the conclusion that the [p]laintiff was disabled for

the closed period of alleged disability" (Pl.'s Mem. at 19–20) and, therefore, that the error was

harmless. The plaintiff's argument overlooks the fact that the length of the treating relationship

was only one factor in the ALJ's decision to afford the FLC opinion partial weight. The ALJ

concluded also that, although the record did "support mental health limitations consistent with

simple, routine, repetitive work[,]" it did "not support any other restrictions based on the overall

conservative treatment, and normal mental status exams in the closed period." (Tr. 23). Therefore,

even with the knowledge that the plaintiff's treating relationship with the FLC was ten months

instead of three months, the plaintiff remains faced with the ALJ's conclusion that the objective medical evidence in the record did not support many of the limitations to which the FLC opined.

Substantial evidence supports the ALJ's conclusion that the record does not support many of the limitations provided in the FLC opinion. For instance, the FLC opined that the plaintiff had "an obvious problem" caring for her "physical needs (e.g. dressing, eating)" and personal hygiene on a daily basis (Tr. 1938); however, the FLC treatment notes in the record do not suggest "an obvious problem." The FLC records provide several instances when the plaintiff appeared "well groomed." (Tr. 2294, 2306–07, 2309–10). And although there was one instance in the FLC treatment records noting that the plaintiff looked "ill physically" (Tr. 2309), there are no treatment notes reflecting problems with the plaintiff's personal hygiene, dress, or eating routines. Moreover, the FLC opinion indicates that the plaintiff had a "very serious problem" with "[p]erforming work activity on a sustained basis (i.e, 8 h[ours] per day, 5 days per week)"; the FLC explained that "[d]ue to chronic pain an 8 [hours per day, 5 days per week job] would be very difficult [and] contribute more to the client's depression." (Tr. 1939). The FLC records, however, do not indicate that the plaintiff ever complained of chronic pain or discomfort. In fact, the only time the FLC evaluated the plaintiff's musculoskeletal system, the treatment note reflects that the plaintiff had scoliosis, but that her "muscle strength and tone" and "gait and station" were normal. (Tr. 2294). Given the lack of support in the FLC's treatment records for the FLC opinion, the Court cannot conclude that a proper understanding of the length of the plaintiff's treating relationship at the FLC would result in the ALJ affording more weight to the FLC opinion and, ultimately, a finding of disability. Accordingly, the ALJ's misreading of the evidence was harmless error.

2.       THE RECORDS OF DR. KAPUR

The plaintiff next argues that "[t]he ALJ['s] decision does not address limitations noted in the treatment records arising from the [p]laintiff's spinal fusion surgery[,]" and that this "failure to account for impairments of the lumbosacral spine, and the recognition by Dr. Kapur that the impairment is not compatible with 'driving, sleeping, sitting, [or] standing for long periods of time[,]' is premised on an error of law, is harmful, and should be reversed."  (Pl.'s Mem. at 19–20).  The defendant responds that the "[p]laintiff's argument is nothing more than a transparent attempt to recast her own subjective statements as a medical source opinion," and that the ALJ's RFC determination accounts for Dr. Kapur's examination findings.  (Def.'s Mem. at 10).

In addressing the impairments that the plaintiff experienced in her lumbar spine, the ALJ explained that, "[i]n terms of the claimant's alleged degenerative disc disease, examinations in 2011, 2012 and 2014 showed moderate scoliosis and surgical scar, spasm and tenderness, [and] positive lumbar facet loading and straight leg raising."  (Tr. 19).  The ALJ cited to records from Dr. Kapur, among others, to support her assertion.  (*See* Tr. 19).  The ALJ also cited to Dr. Kapur's treatment notes when stating that the plaintiff was prescribed physical therapy.  (Tr. 19).  The ALJ concluded that "the record shows the claimant was able to work after her surgery for scoliosis and had good activities of daily living such as hiking and biking.  In order to account for her back pain, the undersigned limited the claimant to light work with occasional to frequent postural activities."  (Tr. 19).

The ALJ did not, as the plaintiff asserts, ignore Dr. Kapur's notation that the plaintiff's "symptoms [were] worse with . . . driving, sleeping, sitting, [or] standing for long periods of time."  (Pl.'s Mem. at 20 (citing Tr. 1575)) (emphasis omitted).  Instead, as the defendant points out, the full notation provides that "*[t]he patient reports* that her symptoms are worse especially with

activities involving driving, sleeping, sitting, and standing for long periods of time, working, and weather changes." (Tr. 1575; *see also* Def.'s Mem. at 10) (emphasis added). Accordingly, this notation from Dr. Kapur was referencing the plaintiff's subjective complaint of pain, not an objective medical finding. The notes from Dr. Kapur's physical examination from the same day reveal that he observed the plaintiff to have a "slightly antalgic" gait; that, although there were some difficulties, the plaintiff was able to walk on her tiptoes and heels; and that the plaintiff experienced "moderate tenderness" on palpation of certain muscles in her back. (Tr. 1576). Dr. Kapur noted also that a motor examination of the plaintiff "[r]evealed full strength in the upper extremities throughout[,]" and that "the patient was noted to have 4+ strength" in the lower extremities. (Tr. 1576). Dr. Kapur diagnosed the plaintiff with, *inter alia*, "myofascial pain with trigger points in the trapezius muscles bilaterally" and noted "clinical evidence for right L5 radiculopathy." (Tr. 1576).

Moreover, approximately one month later, Dr. Kapur noted that the plaintiff's symptoms were "more or less about the same" after four physical therapy sessions, and that her level of pain ranged "from 3–8 in severity." (Tr. 1581). Following a neuromuscular examination, Dr. Kapur stated that the plaintiff's "gait [was] slightly antalgic[,]" that her "lumbar range of motion [was] slightly limited in all directions[,]"; and that the plaintiff "had difficulty toe and heel walking." (Tr. 1581). A motor examination revealed that the plaintiff had "full strength throughout except for 4+ strength on testing the right foot dorsiflexion, right EHL . . . muscle." (Tr. 1581). Dr. Kapur concluded that the plaintiff should "continue with physical therapy sessions for her neck and the low back which appears to be helping to some extent." (Tr. 1582). He added that "if the pain in the low back and right leg continues to persist, then a right L5 transforaminal epidural steroid

injection can also be considered to help relieve her symptoms[,]" and that the plaintiff "would like to consider an injection[.]" (Tr. 1582).

Following an examination in March 2014, Dr. Kapur noted that the plaintiff's "gait is antalgic[,]" and that her "lumbar range of motion is moderately limited [by] pain in all directions." (Tr. 1967). He noted also that the plaintiff reported that "overall with therapy, she feels that she is getting stronger." (Tr. 1967). In April 2014, the plaintiff stated "that when resting or sitting, her pain level is usually 2 to 3, but with standing, walking, or doing activities it can go up to 6 to 7." (Tr. 1959). After a physical examination on the same day, Dr. Kapur indicated that the plaintiff's "gait appeared to be slightly antalgic"; that "she had difficulty toe and heel walking with right leg"; that her "lumbar range of motion [was] mild-to-moderately limited in all directions"; and that she was tender on palpation "over the right paralumbar area[.]" (Tr. 1959). Dr. Kapur included findings from an MRI that he had ordered, which showed, *inter alia*, that the plaintiff "appeare[d] to have slight impingement on the right L5 nerve root on the axial T2 sections." (Tr. 1959). He noted also that the plaintiff was going to schedule an epidural steroid injection. (Tr. 1960).

The ALJ's decision addresses adequately the objective findings and opinions of Dr. Kapur. The ALJ mentioned the positive exam findings and degenerative changes in her lumbar spine. (*See* Tr. 19). Also, in her RFC determination, the ALJ limited the plaintiff to less than light work, noting several postural limitations. (*See* Tr. 18). Although the ALJ did not explain every detail of Dr. Kapur's treatment records, it is apparent that she reached her decision based on a thorough review of the record before her. *See Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983) ("When, as here, the evidence of record permits us to glean the rationale of an ALJ's decision, we do not require that [s]he have mentioned every item of testimony presented to him or have

explained why [s]he considered particular evidence unpersuasive or insufficient to lead h[er] to a conclusion of disability.").

### 3.  THE UNSIGNED MEDICAL OPINION STATEMENT

The plaintiff argues that "the ALJ['s] decision makes no[] reference to the statement appearing at [Tr.] 1999 to the effect that [the] [p]laintiff should be limited to sedentary work *as tolerated*." (Pl.'s Mem. at 22) (emphasis in original; internal quotation marks omitted). The plaintiff explains that it is her "contention" that Zeb Ali, M.D., produced the opinion; however, the defendant disagrees with that contention. (Pl.'s Mem. at 22). In addition to her argument that the ALJ misapplied the treating physician rule with respect to this unsigned opinion, the plaintiff argues also that the ALJ failed to develop the administrative record. The defendant maintains that this opinion is "unsigned, undated, and unattributed to any medical provider" and that, regardless, "[t]he ALJ had no obligation to expressly discuss every page of records submitted, and did not err by failing to mention the unattributed, unsigned statements on page 1999 [of the certified administrative transcript]." (Def.'s Mem. at 11).

"It is the rule in our circuit that the ALJ, unlike the judge in a trial, must h[er]self affirmatively develop the record." *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1997) (internal quotation marks omitted); *see Moreau v. Berryhill*, No. 3:17-CV-396 (JCH), 2018 WL 1316197, at *4 (D. Conn. Mar. 14, 2018) ("An ALJ in a social security benefits hearing has an affirmative obligation to develop the record adequately." (internal quotation marks omitted)). "Whether the ALJ has satisfied this obligation or not must be addressed as a threshold issue." *Id*. "Even if the ALJ's decision might otherwise be supported by substantial evidence, the Court cannot reach this conclusion where the decision was based on an incomplete record." *Id.* (internal quotation marks omitted).

"[E]xpert opinions of a treating physician are of particular importance to a disability determination." *Id.* at *5. "What is valuable about the perspective of the treating physician and what distinguishes this evidence from the examining physician and from the ALJ is [the treating physician's] opportunity to develop an informed opinion as to the physical status of the patient." *Hallet v. Astrue*, No. 3:11-CV-1181 (VLB), 2012 WL 4371241, at *6 (D. Conn. Sept. 24, 2012) (citing *Peed v. Sullivan*, 778 F. Supp. 1241, 1246 (E.D.N.Y. 1991)). However, "the Second Circuit has held that it is not per se error for an ALJ to make a disability determination without having sought the opinion of the claimant's treating physician." *Moreau*, 2018 WL 1316197, at *7 (internal quotation marks omitted). In *Tankisi v. Comm'r of Soc. Sec.*, 521 F. App'x 29, 33–34 (2d Cir. 2013), the Second Circuit stated that "remand is not always required when an ALJ fails in his duty to request opinions, particularly where . . . the record contains sufficient evidence from which an ALJ can assess the petitioner's residual functional capacity."

The parties' dispute focuses on page 1999 of the Certified Administrative Transcript. That page provides, *inter alia*, that "[w]e would also like to have a statement, based on your medical findings, expressing your opinion about the claimant's ability, despite the functional limitations imposed by the impairment(s) to do work-related physical and/or mental activities as appropriate[.]" (Tr. 1999). As for "[p]hysical activities such as sitting, standing, walking, lifting, carrying, handling objects, hearing, speaking and traveling[,]" the unsigned opinion provides that the "[patient] may do sedentary work as tolerated – sitting as tolerated." (Tr. 1999). For "[m]ental activities such as understanding and memory; sustained concentration and persistence; social interaction and adaptation[,]" the unsigned opinion provides that the "[patient] may have trouble w[ith] concentration, social interaction and adaption – perhaps best suited w[ith] solitary situations." (Tr. 1999).

A review of the record reveals that page 1999 is part of a Department of Social Services report addressed to Surgical Associates of Meriden; the full report appears at pages 2000–01. (*See* Tr. 1999; 2000–01). The date "June 21, 2014" appears on the first page of the report (Tr. 2000); however, it is unclear whether that is the date on which the opinion was provided. Also, as noted above, the opinion is unsigned. (*See* Tr. 1999; 2001). Assuming *arguendo*, as the plaintiff maintains, that Dr. Ali did author this opinion, the ALJ did not misapply the treating physician rule because the opinion is not "well supported by medically acceptable clinical and laboratory diagnostic techniques" and is "inconsistent with the other substantial evidence in [the] case record.'" *Burgess*, 537 F.3d at 128 (quoting 20 C.F.R. § 404.1527(d)(2)). Moreover, the ALJ's failure to develop further the origins of this opinion and the absence of the opinion in the ALJ's decision does not warrant remand, as there exists ample evidence in the record from which the ALJ could assess the plaintiff's residual functional capacity. *See Tankisi*, 521 F. App'x at 33–34.

Both Dr. Ali and Peter Leff, M.D. treated the plaintiff at Surgical Associates of Meriden and Midstate Medical Center. (*See generally* Tr. 1361–94; 1969–2003). Dr. Ali and Dr. Leff treated the plaintiff for gastrointestinal issues, including insertion of a jejunostomy tube ("J-Tube"), as well as for issues with skin abscesses. (*See generally* Tr. 1361–94; 1969–2003). Nothing in the treatment records from Dr. Ali or Dr. Neff reveals that they noted any limitations in the plaintiff's ability to do work-related physical activities such as "sitting, standing, walking, lifting, carrying, handling objects, hearing, speaking and traveling." (Tr. 1999, 2001). Similarly, Dr. Ali's and Dr. Neff's treatment records do not note any limitations in the plaintiff's ability to do work-related mental activities, such as "understanding and memory; sustained concentration and persistence; social interaction and adaptation." (Tr. 1999, 2001). Instead, Dr. Ali's and Dr. Neff's records include a CT Scan done in 2012, which revealed "[n]o evidence of an acute

abnormality seen in CT scan of abdomen and pelvis[,]" but noted "[t]horacolumbar scoliosis with post-surgical changes seen to lower back." (Tr. 1362, 1973). The treatment records reveal that the plaintiff presented often with abscesses or problems with her J-Tube, but no other abnormalities or complaints. (Tr. 1364, 1367, 1369, 1371, 1378, 1970, 1974, 1980, 1988, 1990, 1996; *but see* Tr. 1373 (plaintiff complained of "nausea, vomiting, and some diarrhea"), 1374 (same record), 1976 (same record); Tr. 1376 (plaintiff complained of "itching"), 1978 (same record); Tr. 1984 (plaintiff complained of "some right thigh pain")).

Moreover, the other objective medical evidence in the record does not support a conclusion that the plaintiff should be limited to sedentary work or solitary situations. For instance, the records from one of the plaintiff's treating physicians, Tatiana Feld, M.D., reveal mostly normal examination findings. Although under "Active Problems," Dr. Feld noted "Chronic Postoperative Pain[,]" examinations of her musculoskeletal system revealed "no clubbing or cyanosis of the fingernails, no joint swelling seen, there was no joint instability noted and muscle strength and tone were normal." (Tr. 1745–1816). Between March and August 2013, however, Dr. Feld noted that the plaintiff "ambulates with a cane." (Tr. 1772, 1780, 1785, 1797, 1801, 1804, 1807, 1811, 1815). Furthermore, a treatment note dated April 17, 2013, from the University of Connecticut Medical Group Rheumatology Associates, reveals that "[a]rticular examination shows no evidence of any joint pathology. Shoulders, elbows, and wrists have normal motion without pain. She has no evidence of MCP or PIP joint problems or wrist problems. Lower extremity examination shows normal hip, knee and ankle motion, and nontender MTP joints." (Tr. 1836). The note provides also that "[b]ack motion is normal and chest expansion is normal." (Tr. 1836). A December 2013 treatment note from New Haven Rheumatology reveals "[j]oints without active synovitis,

erythema or warmth. [Full range of motion] of axial and peripheral joints. Strength 5/5. 0/18 tender points. DTR's 2+." (Tr. 1834).

Dr. Kapur referred the plaintiff to Hartford Hospital Rehabilitation Network in October 2013. (*See* Tr. 1824). Following an examination in November 2013, the physical therapist noted that the plaintiff reported a present pain level of "2/10[,]" and that, at its best, her pain was a "2/10" and, at its worst, it was a "7/10[.]" (Tr. 1826). The plaintiff reported also that her pain causes "discomfort with dressing, washing, lifting heavy [weights], walking [more than] 1 mile, sitting [more than] ½ hour, standing [more than] 1 hour, sleep, sexual activities, and travel." (Tr. 1826). The physical therapist's assessment provided that the plaintiff

> [complained of] back pain, muscle weakness, and functional limitations . . . . [Patient] presents with postural imbalances, muscle weakness, back and shoulder pain, limited [range of motion] in the spine, muscle spasms, [decreased] flexibility, paresthesia, incontinence of bladder, [decreased] mobility, discomfort with positioning, bed mobility, and her transfers and upright posture are severely guarded. [Patient] will benefit from skilled [physical therapy] services to address pain and impairments in order to maximize function and mobility within available, pain-free, and spinal fusion/restricted ranges.

(Tr. 1828). The physical therapist added that the plaintiff had "good" rehab potential, "but may be slow or limited by her spinal fusion, lengthy history of back pain and systemic infections, and progressive disabling nature of Lyme disease." (Tr. 1828). The examination concluded that the plaintiff suffered from a "moderate disability" in her low back, which was defined as follows: "Individuals in this group experience more pain and problems. Travel and social life are more difficult, and work may be affected. The back condition may be managed through conservative means." (Tr. 1828).

Moreover, in February 2012, the plaintiff reported that "the pain does not significantly affect [activities of daily living] such as getting out of bed, bathing, eating, [and] using the bathroom facility." (Tr. 1452). The plaintiff reported also that she walked her dog and exercised

regularly (*see, e.g.*, Tr. 1782), that she was taking care of her two-year-old nephew and that she planned to return to school (Tr. 2293). Additionally, a May 2012 assessment from the Connecticut Valley Hospital Detoxification Unit noted that the plaintiff reported her recreational interests to be "[p]laying with animals, going hiking, biking, reading, joining up with friends, [and] doing volunteer work." (Tr. 1482). The assessment noted also that the plaintiff "helps her father out almost daily and has been one of his primary caretakers since his cancer was diagnosed." (Tr. 1487).

In March 2014, Dr. Feld saw the plaintiff and noted that an examination of her musculoskeletal system was normal. (Tr. 2379). For the most part, Dr. Feld's treatment notes from April and May 2014 do not reflect any abnormal musculoskeletal findings or that the plaintiff complained of any pain. (*See* Tr. 2359–76). An April 11, 2014 treatment note reveals that the plaintiff was experiencing "right lower back pain and tenderness . . . after [motor vehicle accident] yesterday"; however, the plaintiff reported also that she "feel[s] [she] is getting better." (Tr. 2369). Also in 2014, the plaintiff reported to Dr. Kapur that her back pain had improved and that overall she had been "doing alright." (Tr. 1967).

Moreover, the objective medical evidence in the record does not support limiting the plaintiff to only "solitary situations." The FLC opinion provides that the plaintiff had "no problem" with the following: "[i]nteracting appropriately with others in a work environment"; "[r]especting/responding appropriately to others in authority"; and "[g]etting along with others without distracting them or exhibiting behavioral extremes." (Tr. 1939). Additionally, the State agency consultants opined that the plaintiff was "[n]ot significantly limited" in the following categories: interacting appropriately with the general public; accepting instructions and responding appropriately to criticism from supervisors; getting along with co-workers and peers without

distracting them or exhibiting behavioral extremes; and maintaining socially appropriate behavior and adhering to basic standards of neatness and cleanliness. (Tr. 118, 144). The only instance that the State agency consultants found other than "[n]ot significantly limited" for social interactions was a finding of "moderately limited" regarding the plaintiff's "ability to ask simple questions or request assistance." (Tr. 118, 144).

Based on a thorough review, the Court concludes that the ALJ's decision not to reference the unsigned, undated medical opinion purportedly of Dr. Ali did not constitute a misapplication of the treating physician rule. Nor did the ALJ's decision not to request additional information regarding this opinion constitute a failure to develop the administrative record. As explained above, the objective medical evidence in the record does not support the opinion that the plaintiff could do only sedentary work as tolerated or that she should be limited to solitary situations. Moreover, even without reference to the unsigned, undated opinion, there existed adequate evidence in the record from which the ALJ could determine the plaintiff's RFC. *See Tankisi*, 521 F. App'x at 33–34; *see also Cichocki v. Astrue*, 729 F.3d 172, 178 n.3 (2d Cir. 2013) (per curiam) (holding that an ALJ "need not recite every piece of evidence that contributed to the decision as long as the record permits [the court] to glean the rationale of an ALJ's decision.")

4.     THE WEIGHT ASSIGNED TO THE OPINION OF THE STATE
        AGENCY MEDICAL SOURCES

The plaintiff next argues that the ALJ's finding "that [S]tate agency medical sources are entitled to 'great weight' is in error." (Pl.'s Mem. at 23). The plaintiff's argument here is premised on the ALJ's decision not to address the unsigned, undated opinion discussed in the preceding subsection. The plaintiff claims that the ALJ's failure to discuss the unsigned opinion and, instead, to afford "great weight" to the State agency medical opinion, "runs afoul of the well-recognized regulatory proviso that the treating provider's assessments are entitled to deference." (Pl.'s Mem.

at 24). The defendant maintains that the "State agency physicians provided a thorough explanation of the clinical findings they relied on and the evidence supporting their opinions[,]" and, accordingly, "the ALJ properly gave great weight to the opinions of the State agency physicians." (Def.'s Mem. at 12). The Court agrees with the defendant.

Pursuant to the regulations, an ALJ will generally "give more weight to the opinion of a source who has examined [a claimant] than to the opinion of a source who has not examined [a claimant,]" 20 C.F.R. § 404.1527(d)(1), and the weight an ALJ "will give [non-examining sources'] opinions will depend on the degree to which [the sources] provide supporting explanations for their opinions." 20 C.F.R. § 404.1527(d)(3). In other words, the regulations "permit the opinions of non[-]examining sources to override treating sources' opinions provided they are supported by evidence in the record." *Diaz v. Shalala*, 59 F.3d 307, 313 n.5 (2d Cir. 1995).

As discussed above, the objective medical evidence in the record does not support the unsigned opinion and, therefore, the ALJ did not err by omitting from her decision a discussion of the unsigned opinion. *See* Part V.A.3, *supra*. On the other hand, the evidence in the record supports the opinions of the State agency consultants. The State agency consultants reached their determinations following a review of the plaintiff's records from her treating providers, as well as the plaintiff's own reports regarding her condition. (*See* Tr. 111–12, 135–36).

Concerning the plaintiff's mental impairments, the State agency consultants concluded that the plaintiff was "not significantly limited" with respect to the following activities: remembering locations and work-like procedures; understanding and remembering very short and simple instructions; carrying out very short and simple instructions; sustaining an ordinary routine without special supervision; working with others without being distracted by them; making simple work-

related decisions; interacting appropriately with the general public; accepting instructions and responding appropriately to criticism from supervisors; getting along with co-workers and peers without distracting them or exhibiting behavioral extremes; maintaining socially appropriate behavior and adhering to basic standards of neatness and cleanliness; being aware of normal hazards and taking appropriate precautions; traveling in unfamiliar places or using public transportation; and setting realistic goals or making plans independently of others.  (Tr. 117–19; 143–44).  The consultants opined also that the plaintiff was "moderately limited" with respect to the following activities: understanding and remembering detailed instructions; carrying out detailed instructions; maintaining attention and concentration for extended periods; performing activities within a schedule, maintaining regular attendance, and being punctual within customary tolerances; completing a normal workday and workweek without interruptions from psychologically based symptoms and performing at a consistent pace without an unreasonable numbers and length of rest periods; asking simple questions or requesting assistance; and responding appropriately to changes in the work setting.  (Tr. 117–18; 143–44).

The plaintiff's records from the FLC reveal that, on intake, the plaintiff presented with a "severe" impairment of interpersonal and social interests because she had "[n]o personal time." (Tr. 2291).  The treatment records that follow show that, although there were instances where the plaintiff appeared, *inter alia*, depressed and stressed (*see* Tr. 2303–12), the plaintiff made progress toward her treatment goals (Tr. 2304–12) and typically presented with "good" attention and concentration, "good" judgment and insight, and "logical" and "goal oriented" thought process. (*See* Tr. 2294–2300).  Moreover, the plaintiff's treatment records from Connecticut Valley Hospital ["CVH"] reveal a normal mental status examination upon admission (Tr. 1471–74); the notes upon her discharge show that the plaintiff "successfully completed the program" and that

her condition was "stable." (Tr. 1524, 1527). Accordingly, the objective evidence in the record supports the State agency consultants' findings regarding the plaintiff's mental health impairments.

With respect to the plaintiff's physical impairments, the State agency consultants opined that the plaintiff could occasionally lift and/or carry twenty pounds, frequently lift and/or carry ten pounds, stand and/or walk for six hours in an eight-hour workday, sit for six hours in an eight-hour workday, and had no limitations pushing and/or pulling. (Tr. 114–15; 140). The consultants opined also that the plaintiff could occasionally climb ramps/stairs, never climb ropes/ladders/scaffolds, occasionally balance, frequently kneel, frequently crouch, and occasionally crawl. (Tr. 115, 140–41). The consultants determined that the plaintiff's environmental limitations were unlimited, except that she should avoid concentrated exposure to noise and avoid even moderate exposure to hazards. (Tr. 115–16, 141).

The evidence in the record supports these opinions. For example, the plaintiff underwent spinal fusion surgery in January 2006 (Tr. 666–69), was observed to have an "antalgic gait" and difficulty heel walking in 2013 (Tr. 1963), had several problems with her J-Tube (*see, e.g.*, Tr. 747, 755–60, 778–81, 836–37, 851–60, 1368–72, 1378–79, 1387–88, 1524–26, 1544–46), and experienced gastrointestinal problems (*see, e.g.*, Tr. 1374, 1661, 2144). In 2014, however, the plaintiff was observed to have normal gait and motor strength and reported that her lower back pain had improved. (Tr. 1732–33, 1967). Moreover, Dr. Feld noted that, for the most part, the plaintiff had "moderate" or "stable, moderate" control of her gastrointestinal issues. (*See* Tr. 2469, 2473, 2497, 2562). Although there were a few instances where Dr. Feld noted that the plaintiff had "uncertain" or "poor" control of this condition (*see* Tr. 2481, 2500, 2512, 2545), there were also notations that the plaintiff's condition was "[s]table, improving" (Tr. 2509, 2552), and that

the condition improved following dietary changes. (Tr. 1661). Accordingly, objective medical evidence supports the State agency consultants' opinions regarding the plaintiff's physical impairments.

5.   THE FLC'S OPINION REGARDING THE PLAINTIFF'S PHYSICAL CAPABILITIES

The plaintiff next argues that the ALJ determined erroneously "that the mental health treating opinion is entitled to less than full weight because the medical source lack[s] expertise and knowledge regarding the [p]laintiff's capacity to perform the physical demands of sitting or standing." (Pl.'s Mem. at 24). The defendant responds that, "[b]ecause [the FLC] did not treat [the] [p]laintiff for her physical conditions, the ALJ reasonably gave little weight to this portion of the opinion." (Def.'s Mem. at 8).

"An ALJ may accord less weight to a treating physician where [s]he comments on conditions for which [s]he did not treat." *Medick v. Colvin*, No. 5:16-CV-341 (CFH), 2017 WL 886944, at *6 (N.D.N.Y. Mar. 6, 2017); *see* 20 C.F.R. § 404.1527(c)(2)(ii) (explaining that "if your ophthalmologist notices that you have complained of neck pain during your eye examinations, we will consider h[er] opinion with respect to your neck pain, but we will give it less weight than that of another physician who has treated you for the neck pain."). *See also* 20 C.F.R. § 404.1527(c)(5) ("We generally give more weight to the opinion of a specialist about medical issues related to his or her specialty than to the opinion of a source who is not a specialist.").

In the FLC opinion, discussed in Part V.A.1, *supra*, the treatment providers commented that "[d]ue to chronic pain an 8 [hour per day] 5 [day per week job] would be very difficult [and] contribute more to the client's depression." (Tr. 1939). In her decision, the ALJ afforded the FLC opinion "partial weight" and reasoned, *inter alia*, that the FLC had "no basis for noting the claimant

cannot sit and stand long due to [the provider's] lack of expertise and knowledge in treating the claimant for physical impairments." (Tr. 23).

The ALJ's conclusion that the FLC had "no basis" for opining on the claimant's physical impairments was not erroneous. Throughout the course of her treatment at the FLC, the plaintiff did not complain to the providers of pain or any musculoskeletal issues. As noted above, the only FLC record containing notes about the plaintiff's musculoskeletal system provides that the plaintiff had scoliosis, but that her "muscle strength and tone" and "gait and station" were normal. (Tr. 2294). Accordingly, the ALJ determined properly that there was "no basis" for the FLC to conclude that chronic pain limited the plaintiff's ability to work and would contribute to her depression.

6.    <u>THE WEIGHT ASSIGNED TO THE CONSULTATIVE EXAMINER'S OPINION</u>

The plaintiff's final argument with respect to the ALJ's application of the treating physician rule is that the ALJ erred by affording partial weight to the opinion of the consultative examiner. (Pl.'s Mem. at 25). Specifically, the plaintiff claims that the ALJ's decision improperly overlooks that the consultative examination occurred after the closed period of disability, and that the ALJ improperly afforded "enhanced weight" to the consultative examiner's opinion after the plaintiff's counsel said it had "no objection" to the report's admission. (Pl.'s Mem. at 25).

A medical opinion provided well after the relevant period for establishing disability "may be of little, or no, probative value regarding [the] plaintiff's condition during the relevant time period." *Durakovic v. Comm'r Soc. Sec.*, No. 3:17-CV-0894 (TJM)(WBC), 2018 WL 4039372, at *4 (N.D.N.Y. May 30, 2018) (citing *Williams v. Colvin*, 98 F. Supp. 3d 614, 632 (W.D.N.Y. 2015)). However, the fact that an opinion was prepared after the relevant period does not, on its own, provide a basis for disregarding that opinion. *See id.* (citing *Brown v. Astrue*, 4 F. Supp. 3d

390, 399 (N.D.N.Y. 2012)). The end date for a closed period of disability "should not act as a cutoff with regard to the reports considered on [a] specific issue." *Id.* at *5 (internal quotation marks omitted); *see Cardoso-Navarrete v. Berryhill*, No. 17-Civ-2446 (RJS)(AJP), 2017 WL 6375947, at *11 (S.D.N.Y. Dec. 13, 2017).

Here, the consultative examiner's opinion, which was consistent with the objective medical evidence in the record, "was not so chronologically distant from [the] [p]laintiff's [closed period of disability] to render it irrelevant." *Durakovic*, 2018 WL 4039372, at *5. The closed period of disability ended on June 13, 2014 (*see* Tr. 13), and the consultative examiner completed her evaluation of the plaintiff just over two months later, on August 21, 2014 (*see* Tr. 3029). This time span is distinguishable from cases in which the consultative examination takes place several months or even years following the relevant period. *See, e.g.*, *McNally v. Comm'r of Soc. Sec.*, No. 5:14-CV-76, 2015 WL 3621437, at *13 (N.D.N.Y. June 9, 2015) (stating that ALJ properly afforded little weight to consultative examiner's opinion that was produced over eight years after the relevant time period). Accordingly, even though the consultative examiner evaluated the plaintiff roughly two months after the end of her closed period of disability, the ALJ's decision to afford the consultative examiner's opinion partial weight was not erroneous.

The plaintiff argues also that, because her representative at the hearing did not object to the admission of the consultative examiner's report, the ALJ afforded "enhanced weight" to the examiner's opinion. The Court rejects this argument. Although the ALJ noted that the plaintiff's representative had "no objection" to the admission of the consultative examiner's report (Tr. 22), the ALJ explained that she was affording "partial weight" to the opinion because it was "consistent with the treatment record, showing many normal mental status exams but for depressed mood and constricted affect, and supports the restriction to simple, routine, repetitive work." (Tr. 23). In

short, the examiner's opinion was consistent with the objective medical evidence in the record and the ALJ did not err by affording it partial weight.

B.    <u>THE ALJ'S CREDIBILITY FINDINGS</u>

The plaintiff claims that "the ALJ['s] decision errs in its analysis of the [p]laintiff's claims of disabling limitations arising from pain and other symptoms." (Pl.'s Mem. at 26). The plaintiff makes numerous arguments to support her claim. First, the plaintiff contends that substantial evidence does not support the ALJ's credibility determinations regarding the plaintiff's allegations of frequent bouts of diarrhea. (Pl.'s Mem. at 27–28). Second, she argues that the ALJ relied erroneously on "never confirmed" allegations of Munchausen's and self-harm in discrediting the plaintiff's allegations of pain and other symptoms. (Pl.'s Mem. at 28–29). Third, she maintains that substantial evidence does not support the ALJ's conclusion that the plaintiff did not attempt suicide or present with suicidal ideation during the alleged period of disability. (Pl.'s Mem. at 29). Fourth, the plaintiff argues that the ALJ mischaracterizes the plaintiff's treatment for her physical and mental health conditions as "conservative and mild" and "limited." (Pl.'s Mem. at 29–30). Fifth, the plaintiff argues that substantial evidence does not support the ALJ's contention that the plaintiff could "hike, bike, and volunteer" during the alleged period of disability. (Pl.'s Mem. at 30–31). In response, the defendant maintains that "the ALJ properly evaluated [the] [p]laintiff's subjective symptoms and found that her allegations were not entirely consistent with [the] objective and other evidence of record" and, therefore, that "[s]ubstantial evidence supports the ALJ's conclusions." (Def.'s Mem. at 15).

The "Social Security regulations provide a two-step process for evaluating a claimant's assertions of pain and other symptoms." *Watson v. Berryhill*, 732 F. App'x 45, 52 (2d Cir. 2018) (summary order) (internal quotation marks omitted). The ALJ must decide first "whether the

claimant suffers from a medically determinable impairment that could reasonably be expected to produce [the claimant's] symptoms" and, if so, "the ALJ must then evaluate the intensity and persistence of [the claimant's] symptoms to determine the extent to which the symptoms limit the claimant's capacity for work." *Id.* (internal quotation marks omitted). Moreover, the reviewing court affords "special deference" to an ALJ's credibility determination, as the ALJ "had the opportunity to observe the witnesses' demeanor." *Tarsia v. Astrue*, 418 F. App'x 16, 19 (2d Cir. 2011) (quoting *Yellow Freight Sys., Inc. v. Reich*, 38 F.3d 76, 81 (2d Cir. 1994)) (internal quotation marks omitted).

1.   THE PLAINTIFF'S ALLEGATIONS OF FREQUENT BOUTS OF DIARRHEA

The plaintiff claims that "[t]he contention in the ALJ decision that diarrhea and vomiting are not reported in the medical evidence of record as []frequent occurrences—while specific, is not legitimate—as the medical record demonstrates times when these events did occur with the frequency alleged by the [p]laintiff." (Pl.'s Mem. at 27–28). The defendant responds that "the ALJ properly found that [the] [p]laintiff's complaints about her gastrointestinal symptoms were not supported by the evidence of record." (Def.'s Mem. at 16). The Court agrees with the defendant.

The ALJ concluded that, "[w]ith respect to her physical impairments, . . . the claimant's statements are not consistent with the objective treatment record." (Tr. 20). The ALJ acknowledged that "the record did show numerous hospitalizations, with vomiting, diarrhea and pain with feeding tube placement"; however, "there was also mention that [the plaintiff] could have Munchausen's, purposely messed with her feeding tube, was malingering, and [was not] following the recommended diet." (Tr. 20–21). The ALJ explained that a CT scan of the plaintiff's gastrointestinal system was normal "with [her] symptoms appearing to abate in the latter half of

2012 other than some continued problems with her J-tube[,]" leading to the conclusion that, "while the record showed ongoing treatment with some hospitalizations for these [gastrointestinal] impairments, the treatment record does not support the level of severity alleged by the claimant." (Tr. 21).

The treatment notes regarding the plaintiff's gastrointestinal issues, most notably diarrhea, reflect that, for the most part, the plaintiff had "moderate" or "stable, moderate" control of this condition. (*See* Tr. 2469, 2473, 2497, 2562). Although there were a few instances where Dr. Feld noted that the plaintiff had "uncertain" or "poor" control of this condition (*see* Tr. 2481, 2500, 2512, 2545), there were also notations that the plaintiff's condition was "[s]table, improving" (Tr. 2509, 2552), and that the plaintiff's diarrhea abated following dietary changes (Tr. 1661). In December 2011, the plaintiff reported to Dr. Feld that she had diarrhea every fifteen minutes, including through the night (Tr. 2528); in March 2012, she reported to Dr. Feld that she had diarrhea every hour (Tr. 2498). Although these are two instances where the plaintiff reported frequent diarrhea, the examinations through the closed period of disability reveal mostly normal findings (*see* Tr. 2359–2563) and, as the ALJ noted, the plaintiff's diarrhea seemed to subside midway through the closed period of disability (*see* Tr. 2359–2454). The evidence does not support a finding that the plaintiff had frequent diarrhea on a continuous basis throughout the relevant period. Accordingly, substantial medical evidence supports the ALJ's conclusion that the plaintiff's complaints of diarrhea were not as severe as she alleged during her testimony.

2.      THE ALJ'S RELIANCE ON ALLEGATIONS OF MUNCHAUSEN'S
        SYNDROME

The plaintiff next argues that the ALJ relied improperly on unconfirmed suspicions of Munchausen's syndrome[8] to conclude that the plaintiff's impairments were not as severe as she alleged. (Pl.'s Mem. at 28–29). In response, the defendant reiterates the ALJ's statement that there was evidence in the record that the plaintiff "had purposefully interfered with her [J]-tube," which "raised the question of whether she was malingering or had Munchausen's [syndrome]." (Def.'s Mem. at 15). The Court concludes that substantial evidence in the record supports the ALJ's reliance on allegations of Munchausen's syndrome.

As noted in the preceding subsection, the ALJ stated that "there was also mention [in the record] that [the plaintiff] could have Munchausen's, purposely messed with her feeding tube, was malingering, and [was not] following the recommended diet." (Tr. 20–21). In fact, the ALJ noted specifically that, "[i]n October 2011, [the plaintiff] was noted to be possibly malingering, with possible drug seeking behavior, including intravenous Benadryl, and in November 2011[,] she was noted to have self-induced foreign body granulomas (Munchausen's). In December 2011, her doctor again raised the possibility of Munchausen's which the claimant adamantly denied." (Tr. 20).

Substantial evidence in the record supports the ALJ's mention of Munchausen's syndrome while evaluating the plaintiff's credibility. For instance, upon discharge from Yale New Haven Hospital in June 2011, the physician noted that, "[a]t this point, there were no acute issues from the medical standpoint and gastroenterology[,]" but the plaintiff "was seen by the psychiatry service as consultants raised the question of factitious disorder and possible underlying Munchausen syndrome." (Tr. 764). The physician noted also that, after stopping intravenous pain

---

[8] Factitious Disorder, also known as Munchausen's Syndrome, is defined as "a serious mental disorder in which someone deceives others by appearing sick, by purposely getting sick or by self-injury." *Diseases & Conditions*, MAYO CLINIC.ORG, https://www.mayoclinic.org/diseases-conditions/factitious-disorder/symptoms-causes/syc-20356028 (last visited July 9, 2019).

medication, the plaintiff was "resistant to the changes of her medications and was requesting to continue with her intravenous pain medications." (Tr. 764). Moreover, a November 2011 discharge summary from the Hospital of Central Connecticut provided that the plaintiff's final principal diagnosis was "Chronic Factitious Illness with Physical Symptoms." (Tr. 1137). In addition, according to another record from the Hospital of Central Connecticut, "it was found that [the plaintiff] has been in the hospitals on numerous occasions with illnesses, which appear to be factitious and what seemed to have been brought on by her concern with being cared for." (Tr. 1149). Another record listed her "discharge diagnosis" as, *inter alia*, "[s]elf-induced foreign body granuloma's (Munchausen's)." (Tr. 1160). A physician at the Hospital of Central Connecticut noted also that "[t]he patient clearly does have drug-seeking behavior, and has made multiple requests throughout her hospital stay for specific use of IV Benadryl, IV Dilaudid and has refused all attempts at oral use of these medications either by swallowing or by use of her [J]-tube." (Tr. 1219). The physician opined that the plaintiff "would strongly and greatly benefit from the inpatient hospitalization in a psychiatric unit to monitor behavior and address her addiction as well as her Munchausen-type behavior." (Tr. 1220). And a 2012 discharge summary from Bristol Hospital explained that the plaintiff "tends to split the medical team complaining about different symptoms. She will then change her mind and complain about some other symptoms." (Tr. 1400). Accordingly, there was substantial medical evidence to support the ALJ's mention of Munchausen's syndrome when evaluating the plaintiff's credibility.

### 3.   THE PLAINTIFF'S ALLEGED SUICIDE ATTEMPTS

The plaintiff argues that the ALJ concluded improperly that the plaintiff did not attempt suicide during the closed period of disability and cites two examples in support. (Pl.'s Mem. at 29). The defendant responds that the plaintiff consistently denied any suicidal ideation and that

there were "other plausible explanations for her behavior that appear in the record," supporting the ALJ's conclusion that "the record did not document any suicide attempts during the closed period." (Def.'s Mem. at 16–17). The Court agrees with the defendant.

In her opinion, the ALJ stated:

> During the relevant alleged closed period, examinations were normal but for depressed mood, constricted affect, impaired judgment and disconnected thoughts. . . . Furthermore, while the claimant reported a history of suicide attempts, . . . there was nothing to substantiate that in the record, as she reported no psychiatric treatment and history in May 2012, . . . and later reported no such attempts.

(Tr. 21–22) (citations omitted).

Substantial evidence supports the ALJ's determination that the record did not contain sufficient evidence to establish that the plaintiff had a history of attempting suicide. As the plaintiff points out, she was admitted to the emergency department of the Hospital of Central Connecticut following an incident during which she "had a serrated knife and was trying to cut herself." (Tr. 1001). The treatment note provided that the plaintiff "had expressed suicidal ideations earlier 5 days ago"; however, it also indicated that, at present, "the [p]atient/[f]amily denies [s]uicidal ideations" and that "[t]onight she did not express [suicidal ideation]." (Tr. 1001). The plaintiff explained that she "attempted to cut her wrists because 'of pain.'" (Tr. 1001). Additionally, in April 2012, the plaintiff was admitted to Bristol Hospital when her brother found her unconscious at home after she "reportedly consume[d] 32 tablets of 1 mg Klonopin[.]" (Tr. 1400). While discussing this event, however, the plaintiff denied any suicidal ideation and stated that she actually "only consumed 8 mg of Klonopin[.]" (Tr. 1400–01). Moreover, the plaintiff's treatment records with the FLC reveal that she never once expressed suicidal ideation or plan (*see* Tr. 2289–2312) and, in 2015, she "denie[d] any previous history of suicide attempts." (Tr. 3377).

Accordingly, substantial evidence supports the ALJ's conclusion that the record contained "nothing to substantiate" the plaintiff's alleged history of suicide attempts. (Tr. 22).

### 4. THE ALJ'S CHARACTERIZATION OF THE PLAINTIFF'S MENTAL HEALTH TREATMENT

The plaintiff argues also that the ALJ erred by characterizing the plaintiff's treatment as "limited" and "mild and conservative." (Pl.'s Mem. at 29–30). The plaintiff maintains that she "underwent significant mental health treatment" and had been "treated with aggressive pharmaceutical pain management medication since the age of 13[.]" (Pl.'s Mem. at 29–30). The defendant responds that the ALJ's characterization was reasonable in light of the evidence. (Def.'s Mem. at 17).

While addressing the plaintiff's physical impairments, the ALJ explained that the plaintiff underwent "mild and conservative treatment of physical therapy during the relevant period, and [had] mild MRI findings." (Tr. 20). With respect to the plaintiff's mental impairments, the ALJ opined that "[t]he overall treatment record showed mild and conservative treatment for her depression and anxiety with no hospitalizations or significant inpatient intervention." (Tr. 21). Also, while discussing the State agency consultants' opinions, the ALJ stated that "[t]he objective treatment record, including the normal EEG and neurological exam, mild MRI and limited treatment for back pain, and conservative treatment for depression and anxiety during the requested closed period, also supports these opinions." (Tr. 22).

The ALJ's characterization of the plaintiff's treatment as "mild and conservative" and "limited" was not erroneous. The plaintiff had a spinal fusion surgery years before the relevant period (Tr. 666–69); however, the record reveals that, during the closed period of disability, the plaintiff treated her physical impairments with physical therapy and pain medication. Although the plaintiff took opioids for several years, she stopped taking them in 2012 following a voluntary

detoxification and rehabilitation program. (*See* Tr. 1407–10). From that point on, the plaintiff was treated with suboxone and physical therapy. A physical therapy treatment note rated the plaintiff as having a "moderate disability"; however, it explained that the disability "may be managed through conservative means." (Tr. 1828). Additionally, in 2013, Dr. Kapur recommended that the plaintiff treat her condition with Tylenol and physical therapy. (Tr. 1963). The record does not reveal that the plaintiff underwent any invasive or aggressive treatment measures.

With respect to her mental health impairments, the plaintiff similarly underwent conservative treatment. During the closed period of disability, the only hospitalization related directly to the plaintiff's mental health impairments was for a detoxification and rehabilitation program to address the plaintiff's dependence on opioid pain medication. (*See* Tr. 1465–1527). Although the plaintiff was hospitalized following an alleged overdose on Klonopin, the evidence in the record does not substantiate that this was related to a mental health issue, as the plaintiff took less Klonopin as reported and denied suicidal ideation. *See* Part V.B.3, *supra*. For most of the relevant period, the plaintiff attended counseling sessions with the FLC and elsewhere on an out-patient basis. Accordingly, the ALJ did not err when she characterized the plaintiff's treatment as "limited" and "mild and conservative."

5. THE ALJ'S CONSIDERATION OF THE PLAINTIFF'S ACTIVITIES

The plaintiff's next argument is that substantial evidence does not support "[t]he ALJ decision's finding that [the] [p]laintiff . . . was able to 'hike, bike, and volunteer' during the period of alleged disability[.]" (Pl.'s Mem. at 30). The defendant responds that "[t]he ALJ reasonably relied on [the] [p]laintiff's reported activities, as well as the medical evidence of record and her

treatment history, in finding that she could perform light work." (Def.'s Mem. at 21). The Court agrees with the defendant.

The relevant regulations provide that, when analyzing the credibility of a plaintiff, the ALJ should consider evidence related to the plaintiff's daily activities. *See* 20 C.F.R. § 404.1529(c)(3); *Cichocki*, 534 F. App'x at 76. Here, the ALJ found that "[t]he claimant has reported daily activities not consistent with total disability[.]" (Tr. 19). The ALJ reasoned:

> She is able to drive, attend to her activities of daily living, attend appointments and attend church. . . . She has good relationships with family and friends. . . . Some of the physical and mental abilities and social interactions required in order to perform these activities are the same as those necessary for obtaining and maintaining employment. In addition, despite alleging a history of debilitating medical problems, the claimant was able to attend college and work. She was able to hike, bike and volunteer. . . . The claimant's ability to participate in such activities is not fully consistent with the claimant's allegations of disabling functional limitations.

(Tr. 19) (citations omitted).

In May 2012, when the plaintiff voluntarily admitted herself to the detoxification unit at CVH, the plaintiff was asked if she had "hobbies, leisure, recreational interests that would be supportive to [her] recovery[,]" and she responded, "Playing with animals, going hiking, biking, reading, joining up with friends, doing volunteer work." (Tr. 1482). One of the clinician's at CVH noted that the plaintiff "helps her father out almost daily and has been one of his primary caretakers since his cancer was diagnosed." (Tr. 1487). Moreover, the plaintiff reported to the FLC that she helped care for her two-year-old nephew. (Tr. 2293, 2295).

The ALJ did not err by considering the plaintiff's reported activities and hobbies while analyzing the plaintiff's credibility. The plaintiff alleged that she suffered from severe physical and mental impairments and, as a result, was unable to maintain employment. During the period of alleged disability, however, the plaintiff reported to her treating providers that, as a hobby, she

did volunteer work and stayed active and that these activities were helping her to recover from her opioid addiction. In accordance with the relevant regulations and case law, the ALJ considered properly the plaintiff's daily activities while analyzing her credibility.

## C.    THE ALJ'S STEP-FIVE DETERMINATION

The plaintiff's final argument is that substantial evidence does not support the ALJ's step-five conclusion that jobs existed in significant numbers in the national economy that the plaintiff could perform. (Pl.'s Mem. at 31). The defendant responds that "[t]he hypothetical question posed to the vocational expert . . . adequately captured all of [the] [p]laintiff's limitations as assessed in the RFC" and, therefore, "the ALJ was entitled to rely on the [vocational expert's] opinion regarding jobs that [the] [p]laintiff could perform." (Def.'s Mem. at 21).

The vocational expert testified that the plaintiff could perform the following jobs: marking clerk; cashier; and hand packager. (Tr. 25, 94–95). The ALJ relied on the vocational expert's testimony in concluding that the plaintiff "is capable of making a successful adjustment to other work that exists in significant numbers in the national economy." (Tr. 25).

The plaintiff argues that the ALJ erred in relying on the vocational expert's testimony, as the "positions require interaction with public and others[,]" rendering them "not compatible with [the] [p]laintiff's non-exertional limitations." (Pl.'s Mem. at 31). The plaintiff bases her argument, in part, on the fact that the unsigned, undated opinion provided that the plaintiff should be limited to "solitary situations." (Pl.'s Mem. at 31; Tr. 1999, 2001). She maintains that the unsigned record is "supported by the opinion of treating mental health providers, who opined [that] the [p]laintiff's mental impairments pose 'serious' to 'very serious' problems in her ability to sustain work activity, meet the ordinary demands of the work environment, and complete tasks at a reasonable pace." (Pl.'s Mem. at 31).

The Court has already explained that the medical evidence in the record does not support the assertions in the unsigned, undated opinion. The fact that the ALJ did not reference the opinion in crafting her hypothetical to the vocational expert was, therefore, not erroneous. Moreover, the ALJ accounted for the limitations to which the mental health providers opined by restricting the plaintiff to simple, repetitive, routine tasks. Accordingly, substantial evidence supports the ALJ's step-five determination that jobs existed in the national economy that the plaintiff could perform.

VI.     <u>CONCLUSION</u>

For the reasons stated above, the plaintiff's Amended Motion for Summary Judgment (Doc. No. 32) is *denied*, and the defendant's Motion to Affirm (Doc. No. 34) is *granted*.

This is not a recommended ruling. The consent of the parties allows this Magistrate Judge to direct the entry of a judgment of the district court in accordance with the Federal Rules of Civil Procedure. Appeals can be made directly to the appropriate United States Court of Appeals from this judgment. *See* 28 U.S.C. § 636(c)(3); FED. R. CIV. P. 73(c).

Dated at New Haven, Connecticut, this 22nd day of July 2019.

<u>/s/ Robert M. Spector, USMJ</u>
Robert M. Spector
United States Magistrate Judge
